## IN THE MATTER OF BROWN.

### LUNACY.—JURISDICTION.

*New York Superior Court ; Special Term, December,* 1854.

The New York Superior Court will not take jurisdiction to issue a commission of lunacy.

The nature and extent of the power to take the persons and property of lunatics and habitual drunkards into judicial custody,—reviewed.

Application for a writ in the nature of a commission *de lunatico inquirendo.*

*P. Y. Cutler,* for petitioner.

HOFFMAN, J.—The question whether this court has jurisdiction to issue such a commission as is sought, and jurisdiction in a number of similar cases distinct from equity authority in an action, has been found to be so novel and unsettled that it has engaged the consideration of most of the judges.

The custody of lunatics was not vested in the English court of chancery as such. It was lodged in the crown. That branch of the prerogative might be exercised by any officer the king thought fit. It was ordinarily delegated to a great officer of state, but not necessarily to the Keeper of the Great Seal. A warrant under the sign manual was usually delivered to the lord chancellor or lord keeper upon his coming into office. (4 *Bro. Ch. Pr.*, 223 ; *Shelford on Lunacy*, 157). But the right of the crown to the management and control of lunatics and their estates did not commence until the finding of the office or inquisition of lunacy. (8 *Rep.*, 170 *b*). And the method of ascertaining whether the

party was a lunatic, was a petition to the lord chancellor, suggesting the lunacy, and verified by affidavits. He then issued a writ to the sheriff of the . county where the party resided, to try by a jury, and personal examination, whether the suggestion was true or not. It was the ordinary writ upon a supposed forfeiture to the crown. (*Natura Brevium*, 581).

As rights accruing to the crown by forfeiture or other means were inquirable into by commission as well as writ, the former superseded the latter in practice. (*Ex parte Southcot*, *Ambler*, 111). Both issued under the great seal from the common law side of the Court of Chancery, and were returnable to that court. (*Ibid*).

In Sherwood *v.* Sanderson, (19 *Ves.*, 285), the lord chancellor says that the application is made to the lord chancellor, not as chancellor, but as the person having, under the especial warrant of the crown, the right to exercise the duty of the crown, to take care of those who cannot take care of themselves. The application has therefore no concern with anything passing in the Court of Chancery; but is made to the person holding the great seal in whom the crown has usually thought proper to vest this jurisdiction, as it would be made to any other person having that authority. (See also Lord Redesdale, *Ex parte* Fitzgerald, 2 *Sch. & Lef.* 435). Justice Story *Eq. Jur.* § 1364, *n.* sums up his view of the origin of the jurisdiction thus: "The truth seems to be that the lord chancellor acts merely as delegate of the crown, and exercising its personal prerogative as *parens patri* in chancery, and not as a court of equity."

And M. Fonblanque in his learned note upon Mr. Hargrave's observations, expressly considers the custody of lunatics as a delegation of a power conferred by parliament; noticing the fact that at common law the custody of lunatics and idiots, at least such as held lands, was not in the king, but in the lord of the fee. (2 *Fonblanque*, 230, *n.*) To some extent *at any rate* it is inaccurate to say that the custody of the estates of lunatics existed before the statute of Edward, and was independent of it. (*Ambler*, 707; 2 *John. Ch. R.* 237).

Upon our revolution, the people succeeded to the duties and prerogatives of the crown; and at a very early period they expressly delegated the authority in this matter to the chancellor. The successive statutes were substituted for the king's sign-manual to each lord chancellor or lord keeper. It is on this basis that the jurisdiction in our State is most clearly and safely vested, and the express delegation of the authority of the State as to the custody of the person and estate of lunatics, implied the right of judicially ascertaining who were such; and the course of proceeding almost necessarily followed that of the English chancery.

The statutes of Edward, ch. 9 and 10, afford the model on which our statutes have been framed. The first of these was the act of February 6, 1788, (2 *Greenl.*, 25), enacting that the chancellor should have the care and provide for the safe-keeping of all idiots, and of their lands and tenements, goods and chattels. (§ 1). The second section gives the care and custody of persons and estates of lunatics to the chancellor in like manner, and very nearly in the words of the statute of Edward.

The statute of the 10th March, 1801, embodied these two sections into one. Such was also the enactment in the revision of 1813. (1 *Rev. Laws*, 147, § 1). The Revised Statutes of 1830 adopt it, with slight change of language. (2 *Rev. Stat.* 52, § 1).

The circuit judges under the Constitution of 1822 and the Revised Statutes of 1830, were vested (in cases within their circuits) with all the original jurisdiction and powers which now are, or hereafter may be, vested in the chancellor in all causes and matters in equity, and in all causes or *matters of which the cognizance is or shall be vested in the chancellor*, by *virtue of any Statute*. (2 *Rev. Stat.* 108, § 2).

The act of 1831, appointing a vice chancellor, gave to him the same powers in the first Circuit, and under this act the vice chancellor issued commissions of lunacy. (3 *Edw. Rep.*, 380).

As it is admitted that the jurisdiction was not in the chancellor, by reason of his being the head of the Court of Chancery, it follows that the jurisdiction of the vice chancellor and

circuit judges was conferred by that clause of the act giving them power "in all causes or matters of which the cognizance is or shall be vested in the chancellor by virtue of any statute."

It results also, that the establishment of a court with general equity jurisdiction would not confer this particular power. This would also result from the general doctrine that a newly created court can have no other jurisdiction than such as is expressly conferred. A new court cannot prescribe. (4 *Just.*, 200).

The original jurisdiction of the Superior Court, conferred by the statute of 1828, and as varied or enlarged by any statute down to 1847, admittedly does not extend to such a case.

By the Constitution of 1846, (Art. VI. § 5), it was provided that the legislature shall have the same powers to alter and regulate the jurisdiction and proceedings in law and equity as they have heretofore possessed ; and by the 14th section infe-rior local courts of civil and criminal jurisdiction may be estab-lished by the legislature in cities. By the 12th section of arti-cle XIV. the Superior Court was to remain until otherwise directed by the legislature with its then existing powers and jurisdiction.

It is important, in order to determine the present question, to advert to the legislation in respect to habitual drunkards. The first act upon that subject was that of the 10th of March, 1821 entitled, " an Act concerning the estates of habitual drunk-ards." (*Laws of* 1821, *ch.* 119). It was declared to be lawful for the Court of Chancery of the State to exercise a jurisdiction and power in regard to the estates of persons who shall be incapable of conducting their own affairs in consequence of habitual drunkenness, similar to the jurisdiction and power exercised by that court in regard to the estates of lunatics.

The second section provided that the overseers of the poor might make application to the chancellor for the exercise of such power. By the third, a mode of revising the action of the overseers by a jury before a justice of the peace was pointed out.

Under this statute, the court had no power over the person of the drunkard, but only over his estate. This was so held in

*Ex parte* Lynch, 5 *Paige*, 120. By the Revised Statutes the power of the court was extended to the person as well as the estate, and its authority was placed precisely upon the same footing as over lunatics and idiots. It was declared that the chancellor should have the custody of all idiots, lunatics, persons of unsound mind and habitual drunkards, and of their real and personal estate ; and he was to provide for their safe keeping and maintenance out of their real and personal estates. (2 *Rev. Stats.*, 52, § 1). This statute, the chancellor observed, gave the court a perfect control over the person of an habitual drunkard, which it could exercise through a committee. (*Ibid*).

The statute of 1830 gave the like jurisdiction to the Court of Common Pleas of the County as to the chancellor, where the drunkard's property was less than $250. In vacation, the application might be made to the first judge of the County. There was an appeal to the Court of Chancery. (2 *Rev. Stats.*, 52, § 3, 4, 5, 6). Other sections provided for the mode of obtaining a sale or mortgage of the real estate to satisfy debts. (§ § 11, 12, 13). This statute formed a complete and uniform system upon the whole subject, down to the 1st of March, 1846, when the third edition of the Revised Statutes was published. ·In defining the jurisdiction of the Court of Common Pleas, the Revised Statutes (2 *Rev. Stats.* 208), declared among other things, that they should have and exercise the power and jurisdiction conferred upon them by law, over the persons and estates of habitual drunkards.

Down to this period the Courts of Common Pleas had no jurisdiction as to lunatics, and a defined jurisdiction as to drunkards, nearly co-extensive with that of the chancellor, where the property was less than $250.

The Constitution of November, 1846, (see Article 6, § 14), provided for the election of a county judge, who should hold the county court, and that the county court should have such jurisdiction in their county as the legislature should prescribe.

Then followed the Judiciary Act of May 12, 1847, and the 29th section of Article 4, provided that the county courts should have jurisdiction to hear and determine all matters and proceedings, especially conferred upon and heretofore

triable and cognizable by courts of common pleas of the several counties.

It appears to me that the power of the courts of common pleas as to drunkards, vested in the county courts by force of this provision.

Then in the 31st section it was provided that the said county court "should have equity jurisdiction in suits, and proceedings in the following cases," among them—"for the care and custody of lunatics and habitual drunkards residing in such county."

The clause as to drunkards was, as I view it, superfluous. What extent of jurisdiction was then given by the words as to lunatics? It is to be observed that it is a legislative grant of new jurisdiction to a tribunal of limited powers created by statute, and must be construed strictly. I apprehend it could not possibly be extended beyond the care and custody of the person.

The separation between the power over the person and over the estate, is strikingly shown by the case before Chancellor Walworth, in 5 *Paige*, 120, before noticed, where he held that the statute of 1821, only gave him power over the estate. And in England it is quite common to have separate committees, especially if the lunatic is a female ; when the committee of the person is generally one of her own sex; and a male for the committee of the estate. (*Shelford*, 138, &c.)

The 21st section of the amended Judiciary Act of December, 1847, enacted that the Superior Court and Court of Common Pleas of the City and County of New York, shall respectively have and possess the same equity jurisdiction which is conferred upon the several county courts of the State by § 31, of the chapter referred to, (the Judiciary Act) or by any other act. See also the 22nd section.

At this period then the Superior Court may be considered as having jurisdiction as to the person, but none other.

The Code of April, 1848, provides first, That the courts enumerated (among them this court) shall continue to exercise the jurisdiction now vested in them respectively, except as otherwise prescribed by this act. (Title I. § 10).

The 29th section of the same Code, repealed all statutes

8

then in force, defining or conferring the jurisdiction of the
county courts so far as they conflicted with that act; and
declared "that those courts should have no other jurisdiction
than that provided in the next section." The 30th section
then proceeded to enumerate the cases in which the county
court should have jurisdiction, and among them is the
authority as to idiots, lunatics, and drunkards.

But a marked distinction between the provisions of the
Code and those of the act of 1847, must be noticed. The
whole enactment of the latter was, that the county court
should have equity jurisdiction "in a suit or proceeding for
the care and custody of lunatics and habitual drunkards resid-
ing in such county." But in the Code the provisions are *first*,
by subdivision 8 of section 30. "The care and custody of the
person and estate of a lunatic or person of unsound mind, or
an habitual drunkard residing within the county," and *next*,
by subdivision 6. "The sale, mortgage, or other disposition
of the real property, of an infant or a person of unsound
mind, situated within the county."

The jurisdiction expressly conferred by the Code upon this
court, does not include the power in question. The 33rd sec-
tion read in connection with the 123rd, bestows jurisdiction in
certain enumerated cases where the cause of action shall have
arisen, or the subject of the action shall be situated within the
county, and in the other cases specified, of personal residence
or the service of a summons within the same. These actions
are enumerated in prior subdivisions of section 123. Among
them is an action for partition and for the foreclosure of a
mortgage. But this express delegation of power is in actions,
and relates to actions in the legal sense,—between contesting
parties,—and as distinguished by the Code from special pro-
ceedings.

The legislature in this provision has selected two of the
cases of equity proceedings from the 31st section of the act of
1847, and gives this court authority in those cases by express
enactment. It omits the other cases, such as admeasurement
of dower, sale of infants' estates, and the care of lunatics. The
argument that this amounts to an implied exclusion of such
cases is very strong.

The Court of Common Pleas was placed by the 33rd section of the Code in almost precisely the same situation as this court in regard to jurisdiction, expressly or by implication conferred. The judiciary act as amended, had placed each court in a similar position as to its authority in the present case. Yet it was deemed advisable or necessary to pass an act on the 12th of April, 1854, declaring that the Court of Common Pleas has power and jurisdiction of the following proceedings. To remit fines, &c.—and to exercise all the powers and jurisdiction now or hereafter conferred upon or vested in the said court, or in the county courts in their counties, and the powers and jurisdiction which were vested in the Court of Common Pleas for the City and County of New York, before the enactment of the Code of Procedure passed April 12, 1848.

By this express enactment all the jurisdiction given to county courts by the 30th section of the Code, is now vested in the Common Pleas. It is true the language of the act is a declaration that " the said court *has power and jurisdiction* to exercise all the authority," &c.,—but even supposing the phraseology has been intentionally and technically used, it is too slight a ground on which to imply our own authority.

It is clear that if this court possess any jurisdiction, it could only be to issue the commission and appoint a committee of the person. We could do nothing as to the estate, and a very inadequate power would thus be vested in us.

The result of my examination is, that at least the point of jurisdiction is, even as to the person, so doubtful as to warrant our refusal to attempt its exercise in a matter where questions of title as well as other serious consequences may depend upon its existence, and when the most ample and sure relief is open in other tribunals.

Application denied.