EDWARD HUGHES, Appellant, *v.* JOSEPH H. JONES et al., Respondents.

A deed or mortgage executed by one who thereafter, by inquisition in proceedings *de lunatico*, is found to be a lunatic, although made within the period during which he is declared by the finding to have been a lunatic, is not absolutely void; the proceedings are presumptive, not conclusive, evidence of want of capacity, and may be overcome by satisfactory evidence of sanity.

The petitioner in the lunacy proceedings is not a party to the record in such sense that he is bound by the finding, and precluded from showing that the lunatic was sane, in an action to set aside such a deed or mortgage executed by him.

The title to lands is not involved in such proceedings, and the commission appointed therein has no power to settle a question in regard thereto

Where, therefore, the inquisition in such proceedings found that the title to certain lands was, at the time, in the lunatic, *held*, that this finding was of no force or effect as against one claiming title to the lands under a deed from the lunatic.

The origin and history of lunacy proceedings, both in England and in this country, given.

(Argued June 7, 1889; decided October 8, 1889.)

APPEAL from a judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made October 24, 1885, which affirmed a judgment in favor of defendants, entered upon a decision of the court on a trial at Special Term.

This action was brought by plaintiff, as heir-at-law of Richard Hughes, deceased, to set aside a deed executed by him to defendant Joseph H. Jones, and a mortgage executed by said Hughes and Jones to Caroline A. Root, deceased, of whose will the other defendants are the executors, and for other purposes hereinafter stated.

On the 19th of February, 1816, at Wales, Great Britain, Richard Hughes, plaintiff's father, was married to one Ermine Jones. They had several children, all foreign born, and all of whom are still aliens except the plaintiff, who, in 1870, became a naturalized citizen of the United States. After the birth of these children, and about the year

1834, said Richard Hughes deserted his family and came to the State of New York, where he resided until his death in 1881. Shortly after his arrival in this country he assumed the name of David Jones, and under that name unlawfully married one Margaret Armour, by whom he had a son, the defendant, Joseph H. Jones, who was born before the death of said Ermine Hughes, which occurred in 1856, at Wales, where she had always resided. In 1853 said Richard Hughes became the owner of Buckhorn Island, consisting of one hundred and forty-six and one-half acres of land in Niagara river, Erie county. In May, 1865, the plaintiff, at the request of his father, came to this state, and in November, 1869, began to live with him on said island. March 15, 1870, Richard Hughes, by an instrument dated that day and duly recorded, leased said island to the plaintiff for the term of twelve years thereafter, upon the condition that said lessee should maintain and support the lessor and wife during said term. The plaintiff took possession under the lease and remained in possession until July twenty-fourth of the same year, when he and his father quarreled and he left the island. Subsequently the lease was surrendered. December 5, 1870, he recovered a judgment against his father for $300.47 damages and costs, and on the 22d of May, 1871, he recovered another for $450.51. October 7, 1870, Richard Hughes conveyed said island to the defendant Joseph H. Jones "upon the express condition" and for the consideration that the grantee should "keep, maintain and support" the grantor "and Margaret, his wife," during the period of their natural lives. This deed was duly recorded November 21, 1870. Margaret Jones lived with said Richard Hughes, as his wife, while he resided upon the island, and died shortly after the commencement of this action, in 1881. On August 1, 1871, the plaintiff caused his father to be imprisoned in the county jail of Erie county under said judgments, and thereafter said Margaret and Joseph H. Jones sought to effect his release from such imprisonment by instituting proceedings to have him adjudged a lunatic. The petition, which was signed and sworn to by said Joseph H. Jones only,

alleged that David Jones, "who is the father of your peti-
tioner, now is, and for about the space of five years last past
has been, a lunatic, and being of the age of eighty-six years, is
so far deprived of his reason as to be wholly unfit and unable
to govern himself. * * * Your petitioner further shows
that *her said husband* * * * was known and called by the
name of Richard Hughes; * * * that the said David
Jones owned at the time he became a lunatic, and within the
last two years," the real estate in question, known as Buckhorn
Island. A commission from the County Court of Erie county
was duly issued, and on the 18th of October, 1871, resulted in
an inquisition "that the said David Jones, alias Richard
Hughes * * * is a lunatic and of unsound mind, and
does not enjoy lucid intervals, so that he is incapable of the
government of himself or of the management of his lands, tene-
ments, goods and chattels, and that he has been in the same
state of lunacy for five or six years; * * * that whether
the said David Jones, alias Richard Hughes, being in that
state, has alienated any lands and tenements or not, the jurors
aforesaid know not; that the following lands and tenements,"
describing Buckhorn Island, "yet remain to the said David
Jones, alias Richard Hughes."

The inquisition was duly filed and on the 13th day of
November, 1871, said Joseph H. Jones presented the same to
the County Court with his petition, duly signed and verified,
praying that a person nominated therein might "be appointed
the committee of the person and estate of the said David
Jones, alias Richard Hughes." On the same day the County
Court made an order "on motion of * * * counsel for
the petitioner" that the "finding of the jury, * * * as set
forth in the said inquisition, be and the same is hereby con-
firmed." The same order appointed a committee who duly
qualified and acted as such until the death of said Richard
Hughes. On motion of the committee the judgments recovered
by the plaintiff against his father were set aside "upon the
ground that said Richard Hughes was a lunatic and of
unsound mind when said judgments were recovered."

June 16, 1874, Joseph H. Jones mortgaged said premises to one Caroline Root to secure the payment of $1,000, and the said Richard Hughes united in the mortgage.

The plaintiff asked the court to declare and establish his rights in said premises, to set aside said deed and mortgage as void, and to compel the defendants to surrender and deliver possession of Buckhorn Island to him.

Upon the trial before the Special Term, after proof of the foregoing facts by the plaintiff, the defendants "gave certain evidence tending to show that when said Richard Hughes executed, acknowledged and delivered said deed to said Joseph H. Jones he was not a lunatic, but was of sound mind and capable to manage his person and estate." This evidence was objected to by the plaintiff upon the ground that the record in the lunacy proceedings was conclusive evidence as against said Joseph H. Jones. The objection was overruled and the plaintiff excepted. The plaintiff gave evidence, aside from said record, tending to show that Richard Hughes was a lunatic and of unsound mind when he conveyed said premises, as aforesaid. The court found that said Richard Hughes was competent to execute the conveyance in question, and judgment was rendered dismissing the complaint.

Further facts appear in the opinion.

*George Wadsworth* for appellant. Idiots, persons of unsound mind, and infants cannot alien lands (3 R. S. [5th ed.] 3, § 10), nor can they devise real estate. (3 R. S. [5th ed.] 138, § 1; 137, §§ 24, 25; 135, 136, §§ 12, 17.) As against strangers and third parties the inquisition is only *prima facie* evidence of lunacy and incompetency as to contracts made before office found, but it is conclusive and absolute as to everybody thereafter, whether parties, strangers, third parties or the lunatic himself. (*Wadsworth* v. *Sharpsteen*, 8 N. Y. 388, 391–393; *Fitzhugh* v. *Wilcox*, 12 Barb. 238; *L' Amoureux* v. *Crosby*, 2 Pai. 422; *In re Patterson*, 4 How. Pr. 34; *Demilt* v. *Leonard*, 11 Abb. 252; *Banker* v. *Banker*, 63 N. Y. 409; *Lewis* v. *Jones*, 50 Barb. 645; *Wadsworth* v.

*Sherman*, 14 id. 169; *Van Dusen* v. *Sweet*, 51 N. Y. 378; *Osterhout* v. *Shoemaker*, 3 Hill, 513, 516; 1 Greenl. on Ev. § 556; 2 Phillips on Ev. 99; 4 Cowen & Hill's Notes to Phil. on Ev. [3d ed.] 218, note 88; *Den* v. *Clark*, 5 Halst. 217; *Hoyt* v. *Adee*, 3 Lans. 173, 174; 7 Wait's Act. and Def. 151, 152; *Lancaster Bk.* v. *Moore*, 78 Penn. St. 407; 21 Am. R. 24; *Searles* v. *Harvey*, 6 Hun, 658; Abbott's Trial Ev. 734; Herman on Estoppel, 45, § 52; Shelford on Lunacy, 63, 64; *Hicks* v. *Marshall*, 8 Hun, 327; 16 Alb. Law Jour. 292; *Griswold* v. *Miller*, 15 Barb. 520, 523; *Dane* v. *Viscountess Kirkwall*, 8 Car. & P. 679; *Faulder* v. *Selk*, 3 Camp. 126; *Hall* v. *Warren*, 9 Ves. 609; *Seagerson* v. *Sealey*, 2 Atk. 412; 1 Hag. Ec. 356; *Browning* v. *Ream*, 2 Phill. 69; Big. on Estop. 44; *Steinback* v. *R. F. I. Co.*, 77 N.Y. 408, 501; *In re Christie*, 5 Paige, 242; *In re Giles*, 11 id. 243.) The defendant Jones was a party to the proceedings within the rule that a person is conclusively bound and estopped by the record of an action or proceeding to which he was a party. It makes no difference whether the first adjudication is in a proceeding at common law or one of a summary character. (*Demarest* v. *Darg*, 32 N. Y. 281; *White* v. *Coatsworth*, 6 id. 137; *Kelsey* v. *Ward*, 16 Abb. 98; *Van Orman* v. *Phelps*, 9 Barb. 500; *Burr* v. *Biegler*, 16 Abb. 177; Abb. Trial Ev. 829.) The defendant Jones' petition was a pleading and he cannot be heard nor can evidence be admitted to contradict it. (*Getty* v. *Hamlin*, 46 Hun, 1; *Paige* v. *Willett*, 38 N. Y. 28.) The deed should be set aside because the grantor was a lunatic when he executed and delivered it, and the grantee knew it, and having that knowledge was guilty of fraud. (Story's Eq. Juris. §§ 227, 228, 229; *Griswold* v. *Miller*, 15 Barb. 520; *Dam* v. *Viscountess Kirkwall*, 8 Car. & P. 679; 7 Wait's A. and D. 153; *Molton* v. *Camroux*, 2 Exch. 487; 10 id. 183; *Lincoln* v. *Buckmaster*, 32 Vt. 652; *In re Beckwith*, 3 Hun, 443; 1 Kent's Com. 451, note.) The necessary requirements for the execution of a commission *de lunatico* have been established for many years and were framed by the chancellor. (2 Barb. Ch. Prac. 229.)

*Spencer Clinton* for respondents.   The deed having been executed a year before the proceedings, the inquisition in lunacy is only presumptive evidence of insanity at the time the deed was executed, and this presumption, while it makes it necessary for the grantee to prove that the grantor was sane at the time of the execution of the deed, does not remove the burden of proof from the party alleging insanity. (*Banker* v. *Banker*, 63 N. Y. 409–413 ; *Van Duzen* v. *Sweet*, 51 id. 378 ; 8 id. 388 ; *Lewis* v. *Jones*, 50 Barb. 645–666 ; *Osterhout* v. *Shoemaker*, 3 Hill, 516 ; *L'Amoreaux* v. *Crosby*, 2 Paige, 422 ; *Jackson* v. *Gumaer*, 2 Cow. 568 ; *Wadsworth* v. *Sharpstein*, 8 N. Y. 388 ; *Person* v. *Warren*, 14 Barb. 488, 495 ; 2 Mad. Ch. 573.)   There was no estoppel.  Although nominally a party to the proceeding, the respondent was simply the one who by the act of signing and verifying the petition set the machinery in motion.  (*Remington Paper Co.* v. *O'Dougherty*, 81 N. Y. 474, 489 ; *Outram* v. *Morewood*, 3 East, 346 ; *Boileau* v. *Rutlin*, 2 Exch. 664.)   As the appellant here was no party to the proceeding, there could be no estoppel as to him, and so none as to the respondent, since an estoppel must be mutual.   (*Lansing* v. *Montgomery*, 2 Johns. 382 ; *Lawrence* v. *Campbell*, 32 N. Y. 455.)

VANN, J.  On the trial of this action the court found, as a fact, upon a conflict of evidence, " that said Richard Hughes, at the time of the execution and delivery of the said deed, *   *   *   was mentally competent to execute the same ; that said deed was not executed by said Richard Hughes through force, fraud or undue influence imposed upon him by said defendants, or any or either of them, but the same was the free and voluntary act and deed of said Richard Hughes." It is conceded that there was sufficient evidence to sustain this finding, unless the record in the lunacy proceeding was conclusive evidence, and hence the facts found by the jury therein incapable of contradiction by the defendants in this action.

All contracts of a lunatic, habitual drunkard or person of

unsound mind, made after an inquisition and confirmation thereof, are absolutely void, until by permission of the court he is allowed to assume control of his property. (*L'Amoureaux* v. *Crosby*, 2 Paige, 422; *Wadsworth* v. *Sharpstein*, 8 N. Y. 388; 2 R. S. 1094, § 10.) In such cases the lunacy record, as long as it remains in force, is conclusive evidence of incapacity. (Id.)

Contracts, however, made by this class of persons before office found, but within the period overreached by the finding of the jury, are not utterly void, although they are presumed to be so until capacity to contract is shown by satisfactory evidence. (Id.; *Van Deusen* v. *Sweet*, 51 N. Y. 378; *Banker* v. *Banker*, 63 id. 409.) Under such circumstances the proceedings in lunacy are presumptive, but not conclusive evidence of a want of capacity. The presumption, whether conclusive or only *prima facie*, extends to all the world and includes all persons, whether they have notice of the inquisition or not. (*Hart* v. *Deamer*, 6 Wend. 497; *Osterhout* v. *Shoemaker*, 3 Hill, 513; 1 Greenl. Ev. § 556.)

These principles are now well settled in this state, and no question could have arisen as to the right of the defendants to show that the grantor, at the time the conveyance in question was executed, was of sound mind, but for the fact that the grantee was the petitioner in the lunacy proceedings. It is claimed that he thereby became a technical party to the record, as that expression is commonly understood in law, and, hence, that he is so completely bound by the finding of the jury as to be precluded from attempting to show the actual truth. This point does not appear to have been passed upon by the courts, although there are *dicta* of learned judges bearing somewhat upon it.

A party is ordinarily one who has or claims an interest in the subject of an action or proceeding instituted to afford some relief to the one who sets the law in motion against another person or persons. Interest, or the claim of interest, is the statutory test as to the right to be a party to legal pro-

ceedings almost without exception. Unless a party has some personal interest in the result he can have no standing in court. But any one, even a stranger, can petition for a commission to inquire as to the sanity of any other person within the jurisdiction of the court. While this is now provided by statute it was also the rule at common law, although a strong case was required if the application was not made by some person standing in a near relation to the supposed lunatic. (Code Civ. Pro. § 2323 ; *In re Smith,* 1 Russ. 348 ; *In re Persse,* 1 Moll. 439 ; Shelford on Lunatics, etc., 94 ; 2 Crary's N. Y. Pr. 5 ; Ordronaux' Judicial Aspects of Insanity, 218.)

The origin and history of lunacy proceedings throw some light upon the subject. It was provided by an early statute in England that "the king shall have the custody of the lands of natural fools (idiots), taking the profits of them without waste or destruction, and shall find them in necessaries, of whose fee soever the lands be holden ; and after their death he shall restore them to their rightful heirs, so that no alienation shall be made by such idiots, nor their heirs be in anywise disinherited." (17 Edw. 2d, chap. 9.) The same statute provided for lunatics, or such as might have lucid intervals, by making the king a trustee of their lands and tenements, without any beneficial interest, as in the case of idiots, who were the source of considerable revenue to the crown. (Id. chap. 10 ; *Beverley's Case,* 4 Coke, 127a ; 1 Blackstone's Com. chap. 8, § 18, p. 304.) This statute continued in force from 1324 until 1863. (Ordronaux' Judicial Aspects of Insanity, 4.) The method of procedure thereunder is described by an early writer as follows : "And, therefore, when the king is *informed* that one who hath lands or tenements is an idiot, and is a natural from his birth, the king may award his writ to the escheator or sheriff of the county where such idiot is to inquire thereof." (Fitzherbert de Nat. Brev. 232.) The object of the writ was to ascertain by judicial investigation whether the person proceeded against was an idiot or not, so that the king could act under the statute, for his right to control idiots or lunatics and their estates.

did not commence until office found. (Shelford on Lunatics,. etc., 14.) Subsequently authority was given to the lord chancellor to issue the writ or commission to inquire as to the fact of idiocy or lunacy, and the method of procedure was by petition *suggesting* the lunacy. (Id.; *In re Brown*, 1 Abb. Pr. 108, 109.) It was the ordinary writ upon a supposed forfeiture to the crown, and the proceeding was in behalf of the king as the political father of his people. (Id.; Fitzherbert de Nat. Brev. 581.) As the means devised to give the king his right by solemn matter of record, it was necessary before the sovereign could divest title. (3 Bl. Com. 259; *Phillips* v. *Moore*, 100 U. S. 208, 212; Anderson's Dict., tit. Office Found.) It was used to establish the fact upon which the king's rights depended, as in the case of an alien who could hold land until his alienage was authoritatively established by a public officer upon an inquest held at the instance of the government. Whether the basis of action was lunacy or alienage, or otherwise, the proceeding was in behalf of the public, represented by the king. (Id.) The inquisition was an inquiry made by a jury before a sheriff, coroner, escheator or other government officer, or by commissioners specially appointed, concerning any matter that entitled the sovereign to the possession of lands or tenements, goods or chattels, by reason of an escheat, forfeiture, idiocy and the like. (Chit. Prerog. 246, 250; Staunt. 55; Rappalje & Lawrence Law Dict., tit. Inquest. of Office.)

Thus the law came to us from England, and after the Revolution the care and custody of persons of unsound mind, and the possession and control of their estates, which had belonged to the king as a part of his prerogative, became vested in the people, who, by an early act, confided it to the chancellor, and afterwards to the courts. (Laws of 1788, chap. 12; 2 Greenl. 25; Laws of 1801, chap. 30; Laws of 1847, chap. 280; 1 R. S. 147; 2 id. 52.)

But, while the. same power was confided, the practice or method of exercising that power was not regulated by the

legislature, so that, almost of necessity, the English course of procedure was followed. (*Matter of Brown, supra.*)

For nearly a century there was no statute authorizing any court or officer to issue a commission of inquiry, except as the right to judicially ascertain who were lunatics, etc., was implied from the acts committing their care and custody at first to the chancellor and later to the Supreme Court. The right to judicially learn whether a person was a lunatic or not was inferred from the right to his care and custody, provided he was such. Thus it appears that these proceedings have always been instituted in behalf of the public, at first, in behalf of the king, as the guardian of his subjects, and then in behalf of the people of the state who succeeded to the rights of the king in this regard. In both countries the theory of the proceeding was the same, resting upon the interest of the public, as is apparent from an examination of the various statutes and decisions upon the subject already cited. That interest is promoted by taking care of the persons and property of those who are unable to care for themselves, and, by preserving their estates from waste and loss, preventing them and their families from becoming burdens upon the public. The inquisition is an essential step preliminary to assuming control. It is a judicial determination that the person proceeded against is one of the class of persons whose care and custody has been delegated to the courts by the public. Although it involves the forfeiture or suspension of civil rights over person and property, it acts upon the *status* of the individual only. All the other results follow the judicial decision that the *status* of the alleged lunatic has changed from soundness to unsoundness of mind. It is then and only then that the courts assume control, which they exercise through their own appointee, who is subject, at all times, to their orders The whole world is bound by the inquisition, and no one, unless it is the lunatic himself, more than another. The law is set in motion by information of a more or less formal character spread before the court, not by a party, but, as in a criminal prosecution, by some one who assumes to act in the matter. While the peti-

tioner, in rare cases, has been required to pay costs, it was because he acted in bad faith toward the court by calling upon it to act when he knew that there was no ground for action.

For the same reason Lord ELDON required the brothers and sisters of a supposed lunatic, who could not be considered parties in any sense, to pay the costs occasioned by their opposition to a petition for a commission of lunacy presented by strangers to the family, (*In re Smith, supra.*)

The primary object of the proceeding is not to benefit any particular individual, but to see whether the fact of mental incapacity exists, so that the public, through the courts, can take control. The petitioner can derive no direct benefit from it. The advantage to him, if any, is only such as would result if any other person had first acted in the matter.

Attentive study of the history, nature and object of lunacy proceedings leads to the conclusion that the petitioner therein is not a party to the record so as to be personally estopped by the finding of the jury, except as all the world is estopped.

We also agree with the learned General Term in its conclusion that the title to land was not involved in the proceeding under consideration, and that a commission to inquire as to the mental *status* of an alleged lunatic has no power to settle any such question. Such a tribunal is not adapted to so important an inquiry. It is not constituted for such a purpose, but simply to inform the conscience of the court as to a particular fact, for a special purpose. It would have no pleadings to guide it. No distinct issue upon the subject could be presented. It would be only incidental to the main question, which relates to existing incapacity. When that is found, the care of the person and estate belongs to the court. Unless that is found the court has no further jurisdiction, whatever else may be found. No other inquiry can become material except from its relation to that question. The command of the commission is to inquire whether the person *is* a lunatic and *if* so, from what time, in what manner and how. The period of the incapacity is of no importance unless it includes the present time.

The secondary character of the inquiry as to duration is evident from the fact that if the jury find the alleged lunatic to be of sound mind, they have no power to pass upon any other question, even if they are of the opinion that he has been insane. Moreover, the petitioner would not be allowed to control the proceeding by a settlement or discontinuance or by submitting to a nonsuit, except by permission ot the court, which could allow any one to continue if he abandoned it. (Shelford, 22.)

The difficulty of correcting errors by appeal or review is obvious. In fine, such a method of determining the title to real estate is opposed to the theory and policy of the law, which surrounds landed property with so many safeguards.

We think that the validity of the deed in question was not at issue, and that it could not properly be tried in the lunacy proceeding.

The judgment should be affirmed, with costs.

All concur, except BRADLEY, J., not sitting.

Judgment affirmed.