In the Matter of HARRY KASSLER, an Incompetent Person.

Supreme Court, Queens County, February 28, 1940.

*Irving M. Maron*, for the petitioner.

BROWER, J. It appears that prior to December, 1937, one Harry Kassler and his wife, who is the petitioner herein, were residents of the State of Iowa. Prior to the above time, and on May 7, 1937, following an adjudication to the effect that the said Harry Kassler was mentally incapacitated, his wife was designated by the District Court of the County of Dubuque, State of Iowa, to act as the guardian of his person and property. She duly qualified for such office and since such time has continued to exercise the functions

thereof. During the month of December, 1937, allegedly with the knowledge and consent of the above court in Iowa, petitioner brought her ward, together with their children, to the city and State of New York with the intent of making the latter place their permanent residence and domicile. Thereafter, and pursuant to an application presented to the instant court on November 28, 1939, the petitioner was appointed ancillary committee of such of the ward's property as was located within the State of New York. She qualified to such office by posting a requisite bond and complying in other respects with the requirements of section 1358 of the Civil Practice Act. At the time of her appointment as ancillary committee it was disclosed that assets to the extent of some $15,000 belonging to her ward still remained within the State of Iowa. With respect thereto, the petitioner stated that: " In view of the fact that she and the incompetent now reside in this State and that it is her intention to remain in this State with the said incompetent, she will seek permission to transfer from Dubuque, Iowa, to this State all of the property of the incompetent hereinabove enumerated and now in Dubuque, Iowa, and to that end, upon the appointment of a Committee of the incompetent in this State, will present a final accounting to the District Court in Dubuque, Iowa, and endeavor to obtain an order of transmittal from Dubuque, Iowa to this State of such property of the incompetent as is now in Dubuque, Iowa."

Because of the foregoing statement of intention, and in order adequately to protect the interests of the ward in the event of the effectuation of such purpose, the instant court on January 2, 1940, directed that the petitioner, as ancillary committee, would be required to file a further bond in the sum of $15,000 before receiving into her custody in the State of New York the ward's assets which were proposed to be transmitted from the State of Iowa. Such further bond, conditioned as above, has not yet been filed and, apparently, the Iowa assets of the ward remain within the latter jurisdiction.

It now appears that the final account of the petitioner, as guardian of the person and property of the incompetent in Iowa, has been presented to the proper court therein; that in such proceeding it is prayed that permission be accorded to transmit the incompetent's Iowa assets to the care and custody of petitioner, to be administered for her ward's benefit here in New York; that allegedly the Iowa court has signified " its willingness to regard the State of New York as the domicile of the incompetent and to transmit all of the assets of the incompetent in Iowa to [the] petitioner, as committee of the incompetent in New York, and discharge [the] petitioner as [guardian] of the person and property in Iowa."

Petitioner, however, hesitates to procure her immediate discharge as guardian of her ward's person and property in Iowa upon the apprehension that such discharge in the parent State will *ipso facto* work a termination of the ancillary administration which she has been conducting of her ward's affairs in this State. She stresses, therefore, that "in order to effectuate the suggestion of the Iowa court, it is necessary for this Court to recognize the change in the domicile of the incompetent and the committee from Iowa to New York, which took place in December, 1937, *and now designate your petitioner as domiciliary committee of the person and property of the incompetent,* such designation to become effective upon the discharge by the Iowa court of your petitioner as committee of the person and property of the incompetent in Iowa and upon the filing of a certified copy of such order of the Iowa court with the Clerk of the County of Queens."

She predicates the urgency of her request upon the basis that "it is a needless expense to the estate of the incompetent to have in existence two committeeships, with assets divided, and with the consequent necessity for two accountings in each year."

I am satisfied, under the circumstances disclosed herein, that the removal of the ward from Iowa and his subsequent residence in this State has effectuated a change of domicile. I predicate my conclusion upon the principle that the guardian of the person and property of an individual *non compos mentis* has the right, if acting in good faith on behalf of the latter, permanently to remove his or her ward to another jurisdiction. That right, of course, is subject to the paramount supervision of the particular court which exercises an initial control over the incompetent person. Irrespective of the wishes of the guardian, and even of the incompetent where there is some capacity for the expression of a choice, the court may nevertheless forbid and restrain a removal if it appear prejudicial to the welfare and interests of the afflicted person. (See *Commonwealth* v. *Kernochan*, 129 Va. 405; 106 S. E. 367; 30 A. L. R. 601, 607, and cases there cited.) In the present case the very fact that the District Court in Iowa accorded to the guardian its approval that the ward might be permanently removed from that State to New York is to be given operative conclusiveness upon the question of the propriety of the change. What further effect, however, may be given such approval together with the physical circumstance that the ward and his guardian have availed themselves thereof and have become domiciled within the State of New York? More specifically stated: Does the adjudication of lunacy and the appointment of a committee for the ward's person and property in Iowa constitute, upon the ward's removal to this State, a sufficient basis alone upon

which to justify the court here in designating a domiciliary committee of the person and property of such individual without further inquisition?

A consideration of relevant cases upon such question reveals the difficulty of ascertaining the extent to which generally an adjudication of insanity or of incompetency will be given extraterritorial effect and recognition. Apparently there seems to exist much contrariety of opinion upon the subject. Thus some decisions seem to be predicated either upon the express holding or at least suggestive of a strong intimation that an adjudication of sanity or of insanity in one State is to be given full faith and credit in another or that it is to be recognized as binding under applicable rules of comity. Thus in *Ex parte Lewis* (27 Eng. Rep. 1043), decided in 1749, an adjudication of insanity by the Senate of Hamburg was held determinative upon the question of the capacity of such individual when located within the jurisdiction of the English courts. More recently in *Poorman* v. *Carlton* (122 Kan. 762; 253 P. 424), decided in 1927, it was held that pursuant to the full faith and credit provision of the Federal Constitution, the judgment of a competent court in the State of Oklahoma, which declared a person to be of unsound mind and provided for the appointment of a guardian for him, was to be given the effect of fixing his status universally; and that such status accompanied the individual himself into the sister State of Kansas. Such doctrine, however, has been flatly repudiated by other courts. Thus in *Matter of Kingsley* (160 Fed. 275) it is said that " The disability of a person under guardianship does not follow him when he removes to another State. Such disability is a creature of the statute, and cannot affect the rights of parties outside of the operation of the statute under which guardianship proceedings were had." A like conclusion was reached in *Hull* v. *Gallup* (49 Conn. 279).

The rationale of the cases which deny conclusive recognition of a foreign adjudication of incompetency seems predicated upon the view that, because of the possibility of an improvement in the mental condition or even of a complete cure of the affliction, the adjudication itself is not intended to be permanent or immutable, either in the State of its rendition or elsewhere. (See *Jacobs* v. *Jacobs*, 127 Misc. 505; affd., 217 App. Div. 753; *Matter of Prentice*, 110 Misc. 456; *Anonymous* v. *Anonymous*, 166 id. 861; *McNeill* v. *Harlow*, 81 Fla. 401; 88 So. 127.) Our own statute (Civ. Prac. Act, § 1382) providing for the restoration of an erstwhile incompetent's property is founded upon the assumption that an adjudication of incompetency does not presuppose the fixation of any static legal condition or disability on the part of the ward.

A consideration of the very elasticity of procedure which is permitted under that section, upon an inquiry into the question whether in fact a formerly adjudged incompetent has returned to sanity, emphasizes the conclusion that a judicial declaration of one's mental disability does not contemplate immutability. Thus when an application is made for an order superseding the committee, wide discretion is vested in the court. In the exercise thereof it may cause the incompetent to be brought before him for personal examination. It may appoint an expert to examine him and report as to his condition. It may refer the matter to a referee for the taking of evidence and the submission of a report thereon. It may determine the question upon affidavits or he may authorize a jury to decide the issue. (See *Matter of Blewitt*, 138 N. Y. 148, 149; *Matter of Curtiss*, 199 id. 36, 40.)

The cases which withhold recognition of the foreign adjudication as binding upon the question of the alleged incompetent's capacity or incapacity may also be founded upon such reasoning as is contained in the recent edition of Beale on Conflict of Laws (Vol. 2, § 120.9) that " *insanity is not a status*. If insanity is found at the domicile it does not affect the condition of the person in another State; *if he is to be treated as insane in the other State, he must there be found insane.*" (Italics supplied.) (To a similar effect see Story, Conflict of Laws [7th ed.], § 504.)

What then is the extent of faith and credit to be given to an adjudication by the court of a sister tribunal declaring an individual to be *non compos mentis* and appointing a guardian of his person and property? Such decree is not effective as fixing the universal or extraterritorial status of the ward as a lunatic, but merely declares that within the limits of the local jurisdiction, wherein the adjudication was made, his mental capacity is such as to justify the administration of his affairs through the interposition of a guardianship. (See *Leonard* v. *Leonard*, 14 Pick. [Mass.| 280.) A decree of such character is elsewhere conclusive merely to the effect that within the territorial limits of the local jurisdiction a guardianship, with the incidents thereof, exists over the affairs of a particular ward. It does not follow, however, that a recognition of the existence of such local guardianship presupposes a concomitant extraterritorial recognition of the fact that the ward is universally to be regarded as incompetent.

A consideration of applicable statutes in our own State seems to justify the conclusion above reached. Prior to the enactment of section 2326 of the Code of Civil Procedure (now Civ. Prac. Act, § 1363), the courts of this State were not conferred with power to to appoint a foreign committee of a non-resident who had been

judicially declared incompetent. They were, however, authorized to give full faith and credit to the foreign adjudication of incompetency in so far as it might justify the appointment of a resident committee to take control of assets locally situated. (*Matter of Neally*, 26 How. Pr. 402; *Matter of Perkins*, 2 Johns. Ch. 124.) The enactment of section 2326 was merely a further extension and legislative application of the principles of comity in that it gave to the court additional discretionary power to appoint the foreign guardian himself as an ancillary officer. Both prior and subsequent to the enactment of section 2326, it will be noted that the foreign inquisition was accepted by the courts of this State as conclusive upon the question of the propriety of, and necessity for, an ancillary administration. (See, also, *Seitz Estates, Inc.*, v. *Seitz*, 226 App. Div. 373, 380.)

There is, however, no statutory warrant for the acceptance of a foreign adjudication of lunacy as controlling upon the question of the capacity or incapacity of a resident of this State. (See *Matter of Curtiss*, 134 App. Div. 547; affd., 197 N. Y. 583; *Matter of McHie*, 233 App. Div. 388.) Consequently, a domiciliary committee of such person can be appointed only after the issuance here of a commission and the determination of a jury as provided by section 1364 of the Civil Practice Act. " The inquisition is an essential step " preliminary to the assumption of control by the court over the person and property of the alleged *resident* incompetent. (See *Hughes* v. *Jones*, 116 N. Y. 67, 76.) The comity which we extend to the decrees of sister States does not justify an assumption that we may ignore our own statutory requirements in ascertaining the necessity for the appointment of a domiciliary committee. If it be assumed that petitioner's husband, *now resident in this State*, is still bereft of a competent mind, and because of such fact requires the appointment of a domiciliary committee, then the question of his sanity and the appointment of such committee " can only be done in an appropriate proceeding maintained as prescribed by the provisions of the Civil Practice Act." (See *Matter of McHie, supra*, p. 390.)

Motion denied without prejudice to an application in accordance with the applicable provisions of the Civil Practice Act.